TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (SBN: 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
VERONICA DRAGALIN (SBN: 281370)
MELISSA MILLS (SBN: 248529)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2091/0647/0627
     Facsimile: (213) 894-7631
     E-mail: Mack.Jenkins@usdoj.gov
             Veronica.Dragalin@usdoj.gov
             Melissa.Mills@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-326(A)-JFW |
|---|---|
| Plaintiff, | GOVERNMENT'S SUPPLEMENTAL BRIEF IN SUPPORT OF OMNIBUS OPPOSITION TO DEFENDANTS DAE YONG LEE, 940 HILL, LLC AND SHEN ZHEN NEW WORLD I, LLC'S MOTIONS TO SEVER (CR 200 AND CR 201); DECLARATION OF VERONICA DRAGALIN; EXHIBITS |
| v. | |
| JOSE LUIS HUIZAR, et al. | |
| Defendants. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, Veronica Dragalin, and Melissa Mills, hereby files its Supplemental Brief in support of its Omnibus Opposition to defendants DAE YONG LEE and 940 HILL LLC's Motion to Sever (CR 200) and defendant SHEN ZHEN

NEW WORLD I, LLC's Motion to Sever (CR 201), pursuant to the Court's order at the January 7, 2022 hearing.

This Supplemental Brief is based upon the attached memorandum of points and authorities, the Declaration of Veronica Dragalin and attached exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 21, 2022                Respectfully submitted,

                                       TRACY L. WILKISON
                                       United States Attorney

                                       SCOTT M. GARRINGER
                                       Assistant United States Attorney
                                       Chief, Criminal Division


                                       _____
                                       MACK E. JENKINS
                                       VERONICA DRAGALIN
                                       MELISSA MILLS
                                       Assistant United States Attorneys

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

# TABLE OF CONTENTS

I.   BACKGROUND.......................................................1

II.  OFFER OF PROOF...................................................3

     A.   Four Key Participants in the CD-14 Enterprise Admitted
          the Existence of a Single Scheme and Described its
          Method of Operation.......................................4

     B.   Developers' Common Objective..............................7

          1.   HUANG and SZNW.......................................7

          2.   LEE and 940 HILL.....................................9

          3.   Developers Jia Yuan and Company M...................11

     C.   Constant Participants and Method of Operation...........12

     D.   Developers' Interest in Success of the Entire
          Operation...............................................14

III. ARGUMENT........................................................15

     A.   Applicable Law on Single vs. Multiple Conspiracies......15

     B.   Evidence Establishes an Overall Agreement...............16

          1.   The Common Objective of the Conspiracy.............16

          2.   The Key Participants and Method of Operation.......19

     C.   Benefits Depended on Success of Entire Operation........21

IV.  CONCLUSION......................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

Boyle v. United States,
       556 U.S. 938 (2009)........................................16

Odom v. Microsoft Corp.,
       486 F.3d 541 (9th Cir. 2007)..............................16

United States v. Arbelaez,
       719 F.2d 1453 (9th Cir. 1983)..........................18, 25

United States v. Berger,
       224 F.3d 107 (2d Cir. 2000)...............................18

United States v. Boone,
       628 F.3d 927 (7th Cir. 2010).............................2, 3

United States v. Fernandez,
       388 F.3d 1199 (9th Cir. 2004).............................15

United States v. Kenny,
       462 F.2d 1205 (3d Cir. 1972)...............................3

United States v. Loftis,
       843 F.3d 1173 (9th Cir. 2016)..............................2

United States v. Morse,
       785 F.2d 771 (9th Cir. 1986).........................16, 20, 21

United States v. Perry,
       550 F.2d 524 (9th Cir. 1977).........................18, 21

United States v. Sheeran,
       699 F.2d 112 (3d Cir. 1983)................................2

United States v. Singh,
       979 F.3d 697 (9th Cir. 2020)..........................passim

Zafiro v. United States,
       506 U.S. 534 (1993)....................................3, 5, 8

**TABLE OF EXHIBITS**

| Exhibit | Description | Page(s):Line(s) |
|---|---|---|
| 1 | Factual Basis from GEORGE ESPARZA's plea agreement, Case No. 20-CR-209-JFW, Dkt. 9 | 4:13, 17, 22, 25; 7:17; 9:8, 17, 25; 10:19; 15:1 |
| 2 | Factual Basis from GEORGE CHIANG's plea agreement, Case No. 20-CR-203-JFW, Dkt. 7 | 5:3, 5, 9 |
| 3 | Factual Basis from JUSTIN KIM's plea agreement, Case No. 20-CR-154-JFW, Dkt. 7 | 5:15, 18, 20, 25, 27; 11:5 |
| 4 | Factual Basis from MORRIE GOLDMANS's plea agreement, Case No. 20-CR-369-JFW, Dkt. 9 | 6:4; 17:26 |
| 5 | Statement of Facts, Jia Yuan Non-Prosecution Agreement | 11:23 |
| 6 | Statement of Facts, Company M Non-Prosecution Agreement | 12:5 |

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2 **I.    BACKGROUND**

3       On January 7, 2022, at a hearing on defendants SHEN ZHEN NEW

4 WORLD I, LLC ("SZNW"), DAE YONG LEE ("LEE"), and 940 HILL, LLC ("940

5 HILL") (collectively, the "Developer Defendants") motions to sever

6 (CR 200 and CR 201), the Court ordered the Government to file an

7 "Offer of Proof," describing the evidence it intends to offer to

8 establish that the Developer Defendants were participants in the

9 single scheme alleged in the First Superseding Indictment ("FSI").

10 (CR 330.)

11       The FSI alleges a scheme to defraud the City of Los Angeles and

12 its citizens of their right to the honest services of their public

13 officials, and identifies its participants as including all charged

14 defendants.  (CR 71, FSI ¶ 44.)  The FSI then describes the

15 consistent means and methods of this scheme to defraud, including the

16 roles of each defendant.  (FSI ¶ 45.)  The FSI then alleges specific

17 wires and mailings the defendants caused "for the purposes of

18 executing the above-described scheme to defraud."  (FSI ¶¶ 46, 47.)

19 Count One alleges a single RICO conspiracy that employed nearly

20 identical means and methods by the same participants.  (FSI ¶¶ 40-

21 42.)

22       The Developer Defendants argue that the FSI alleges multiple

23 schemes and conspiracies involving multiple development projects

24 instead of one overarching scheme.  They argue that since they are

25 only charged for their respective wires in their respective scheme,

26 evidence of their co-schemers' involvement in other uncharged schemes

27 (or projects) is therefore inadmissible against them, warranting

28 severed trials.  Defendants are wrong.

First, the crimes charged against the Developer Defendants require proof of the fraudulent scheme as a whole.  "The elements of wire fraud are: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud."  United States v. Loftis, 843 F.3d 1173, 1177 (9th Cir. 2016) (citation omitted).  "The crime charged in a wire fraud prosecution therefore includes not only the specific executions of the scheme alleged as the second element of the offense but also the overall scheme alleged as the first element of the offense."  Id.  Thus, "a mail fraud or wire fraud offense necessarily includes a fraudulent scheme as a whole."  Id.

Second, evidence of the co-schemers' conduct in different aspects of the scheme would be admissible against the Developer Defendants even in a severed trial.  "[E]vidence showing the existence of a conspiracy, its mode of operation, and the other conspirators' participation is admissible at the trial of a severed co-conspirator who was not involved in such conduct."  United States v. Sheeran, 699 F.2d 112, 118 (3d Cir. 1983).  "It is well established that acts in furtherance of a conspiracy, committed by co-conspirators not on trial, are admissible against a defendant even though that defendant did not participate in those particular acts."  Id. at 118 (citations omitted).  Applying that reasoning, the Third Circuit concluded that evidence of the co-schemers' pattern or plan "does not become irrelevant merely because it is not probative of appellant's own personal involvement," rejecting an argument that such evidence was "inviting an inference that appellant must have been bribed by the Boffas, as other union officials had been bribed by them."  Id. at 117; see also United States v. Boone, 628 F.3d 927,

934 (7th Cir. 2010) (in bribery case, even acts "which involved different participants in the scheme, could be introduced to prove the overarching scheme").  "[T]he definition of the scheme itself is a limiting principle, in that only evidence of the same scheme as opposed to a related or distinct scheme, is admissible." Id. at 935. Here, evidence supports the indictment allegations that the co-schemers had a single overarching scheme.[1]

## II.   OFFER OF PROOF

The question before the Court is whether it is more likely than not that a single conspiracy or scheme existed as alleged in the indictment.  As discussed below, the relevant inquiry is (1) whether the evidence establishes an overall agreement with a common objective, constant key participants, and method of operation, and (2) whether each defendant had reason to believe his benefits depended on the success of the entire operation.  The facts support that all defendants were part of a single cohesive scheme made up of interrelated participants whose common objective of maintaining a corrupt relationship with a powerful City Councilmember, HUIZAR, depended on keeping HUIZAR in power and in their pockets.

---

[1] Even if the Court finds no single scheme existed and therefore some evidence is inadmissible against the Developer Defendants, severance is not required.  "The prospect that certain evidence is admissible against one defendant but not against another defendant is a feature of all joint trials." United States v. Kenny, 462 F.2d 1205, 1218 (3d Cir. 1972).  Even "[w]hen the risk of prejudice is high [from less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Zafiro v. United States, 506 U.S. 534, 538-39 (1993).  Pursuant to the Court's instructions at the hearing, the government will not address the issue of whether limiting instructions can cure any potential undue prejudice in this supplemental brief, but maintains that such instructions would be sufficient to cure any risk.

**A.   Four Key Participants in the CD-14 Enterprise Admitted the Existence of a Single Scheme and Described its Method of Operation**

The government's theory of the case is supported by the factual admissions of four key co-schemers, who have each pled guilty and admitted the existence of a single scheme with a common method of operation and key participants.

George Esparza pled guilty to RICO conspiracy and admitted the existence of the CD-14 Enterprise, which was "composed of a group of individuals associated for a common purpose ... to achieve the goals of the enterprise," including to enrich its members and associates, to advance its political goals and maintain control and authority of the enterprise, to conceal its financial activities, and to protect the enterprise by obstructing justice. Ex. 1 at 1.  In exchange for bribes from developers, CD-14 Enterprise members and associates "would take official action to ensure certain development projects and CD-[14] Enterprise associates received favored treatment from the City and thereby secure their bribe-financed influence." Id. at 2. Esparza, along with other members and associates, "operated and helped to operate a pay-to-play scheme within the City, wherein public officials solicited and demanded direct and indirect financial benefits from developers and their proxies in exchange for official acts." Id. at 3.  Esparza admitted he executed the pay-to-play scheme with respect to at least three projects or sub-schemes, including the L.A. Grand Hotel, the 940 Hill Project, and the "Businessperson A Retainer Payment Scheme." Id. at 4-14.  Esparza's admitted co-schemers were HUIZAR, CHAN, HUANG, SZNW, LEE, 940 HILL, Kim, Executive Director E, and Businessperson A.

George Chiang similarly pled guilty to RICO conspiracy and admitted the existence of the CD-14 Enterprise, its common purpose and goals.  Ex. 2 at 2-3.  "[T]hrough a scheme that involved bribery and honest services fraud, defendant CHIANG and [CHAN]" provided benefits to public officials in exchange for official acts.  Id.  "In order to advance the goals of and ensure the continued existence of the CD-[14] Enterprise, defendant CHIANG, [Esparza], [CHAN], and Kim strategized ways to 'protect' [HUIZAR] to ensure [his] power and relevance within the City."  Id. at 5.

Similarly, Justin Kim pled guilty to bribery and admitted he and Esparza "strategized ways to protect [HUIZAR] to ensure [his] power and relevance within the City, including repeatedly discussing being loyal to [HUIZAR], because, at least in part, it meant securing future financial opportunities for defendant KIM and [Esparza]."  Ex. 3 at 1.  Kim also supported a "succession plan that would maintain or increase financial opportunities for at least defendant KIM and [Esparza] after [HUIZAR]'s term as councilmember of CD-[14] expired."  Id. at 2.  Kim and Esparza shared a common goal of ensuring HUIZAR's "relative was elected for their own political and potential financial benefit and their own twelve-year plan."  Id.  In furtherance of that goal, Kim agreed with HUIZAR, Esparza, and Goldman to establish political action committees to benefit HUIZAR's relative's campaign. Kim hoped to "increase business opportunities" by providing financial benefits in exchange for favored treatment by HUIZAR and his staff, the same motive applicable to SZNW, LEE, and 940 HILL.  Id.  Kim admitted his role in the 940 Hill Project, which implicated HUIZAR, LEE, 940 HILL, and Esparza.  Id. at 3-9.

1    Morrie Goldman pled guilty to conspiracy and admitted that

2  "HUIZAR and others planned to have Relative A-1 succeed him as

3  Councilmember for CD-14 in order to maintain a political stronghold

4  in the City."  Ex. 4 at 1.  At HUIZAR's request, Goldman "solicited

5  and pressured real estate developers with projects pending before the

6  City to contribute to PAC A in exchange for favorable treatment of

7  their projects by Huizar and the City."  Id. at 1-2.  In particular,

8  Goldman admitted the details of how the pay-to-play scheme operated

9  to benefit one such project, Project M, and his admitted co-schemers

10 included HUIZAR, Esparza, Kim, and Company M.  Id. at 8-21.

11   These factual admissions and the corroborating evidence

12 underpinning the indictment establish the existence of the CD-14

13 Enterprise, a group of individuals with a common objective: creating

14 and perpetuating a pay-to-play scheme in the City of Los Angeles

15 whereby public officials involved in the approval of large-scale

16 development projects sold their official acts in exchange for

17 benefits from eager and willing developers, at the exclusion and

18 detriment of those unwilling to play along.[2]  This common objective

19 allowed the group to achieve its goals to enrich its members and

20 associates, maintain control and authority of the enterprise, conceal

21 its financial activities, and protect the enterprise by obstructing

22 justice.  The group, through its key participants who stayed

23

24    [2] For example, on May 11, 2017, in a telephone call, George
   Esparza and Executive Director E discussed punishing a developer who
25 was not providing financial benefits to HUIZAR by withholding
   approvals for the developer's project.  Specifically, Esparza said:
26 "[Company G] has not come through with any other commitments to us,
   to you, so you know, why even be helpful to them, you know, that's my
27 thing... So I'm going to tell [HUIZAR] that I spoke to you and let's
   just continue to ignore them, you know.  We are not going to help
28 them."  Executive Director E then added: "And even [defendant CHAN]
   doesn't want you guys to work with [Company G]."  FSI, Overt Act 342.

6

constant, achieved its goals by employing the same method of
operation for multiple development projects.

**B.   Developers' Common Objective**

1.   <u>HUANG and SZNW</u>

Like all members and associates of the CD-14 Enterprise, HUANG
and SZNW had the common objective to create and perpetuate the pay-
to-play scheme.  This allowed them to achieve the common goals of the
criminal enterprise and conspiracy through the same method of
operation:

(1) **Enriching the members of the conspiracy.**  HUANG and SZNW had
a lot to gain from having an inside, illegal fast track for approval
of major development projects in Los Angeles.  HUANG owned not just
the L.A. Grand Hotel, located in CD-14, but another hotel under the
purview of the PLUM Committee and City Council.  HUIZAR, CHAN, HUANG,
Esparza and others "established a mutually beneficial agreement to
exchange a stream of benefits for official acts and to further the
CD-[14] Enterprise's goals."  Ex. 1 at 4.  Paying bribes for
favorable treatment was financially preferable to the expense and
cost associated with approval delays and hurdles.  Moreover,
identifying a corrupt politician who would take not just a single
bribe from a single developer but who instead was willing to
integrate that into his way of doing business with certain preferred
developers willing to pay his price supported the ongoing existence
of this scheme.

(2) **Maintaining operation of the enterprise.**  HUANG and SZNW had
an interest in unlawfully helping elect Relative A-1 through foreign
contributions, because that would ensure they could continue
benefiting through the bribery pay-to-play scheme they helped create

and that would remain in place after HUIZAR was termed out in 2020.[3]
Defendant HUANG would need more than just a single act of purchased
largesse from a City official but in fact would need continued
assistance at multiple stages of the City approval process for his
77-story tower redevelopment project of the L.A. Grand Hotel, a
process that was only formally initiated in June 2018 and could last
well past HUIZAR's term.  That process would likely include, among
other things, union issues that HUIZAR could resolve favorably in
PLUM, like he agreed to do for developers LEE, 940 HILL, and Company
M.[4]  Defendant HUANG also had an incentive to perpetuate this scheme
because he, like developers LEE, 940 HILL, Jia Yuan, and Company M
(all implicated in the FSI), had plans to also redevelop more than
one property in the City.[5]

     (3) **Concealing financial activities.**  Like other co-
conspirators, HUANG and SZWN had an incentive to conceal financial

---

[3] See FSI Overt Acts 71-84 under the heading "CD-14 Enterprise
Members' Solicitation of Political Contributions by Foreign Nationals
to Help Maintain the Enterprise's Political Power."

[4] See, e.g., Casino_0815197 (letter from Labor Organization A to
defendant HUANG requesting meeting regarding "77-story tower");
Casino_0814808 (report from consultant to SZNW regarding L.A. Grand
Project, noting: "Support from the unions is critical to obtaining
the City's approval.  The unions are a significant power in the City,
and having their support provides a smoother entitlement process.  In
particular, it is unlikely that Councilman Huizar of CD 14 will
support the project if the unions are opposing it.  Not having the
support of the unions will plague the project with turmoil.... This
direct pressure from such a significant labor organization could flip
Councilman Huizar from support to oppose."").  Support by the unions
and HUIZAR would in turn mean "the project will be well-positioned to
receive the Transient Occupancy Tax (TOT) subsidies from the City
worth tens of millions of dollars."  Id.

[5] See, e.g., Casino_0824817 (June 7, 2018 application for
redevelopment of Universal Hotel to include "31-story hotel tower");
Casino_0824684 (June 6, 2018 letter from defendant HUANG to City
Planning authorizing application and confirming ownership of
Universal Hotel).

activities and bribes to protect themselves, HUIZAR, and the continued criminal enterprise.  HUANG therefore went to great lengths to hide his "loan" to HUIZAR through a sham entity and provided casino chips and other benefits that were more difficult to trace.[6]

(4) **Protecting the enterprise by obstructing justice.**  HUANG shared the common goal of protecting the CD-14 Enterprise from law enforcement detection, by, for example, sharing his suspicions that the FBI was investigating HUIZAR.  See, e.g., Ex. 1 at 9 (HUANG warned HUIZAR that he "heard from multiple sources that the FBI was looking into [HUIZAR]").  On May 1, 2017, Esparza discussed a possible FBI investigation into HUIZAR with Chiang during an intercepted call, stating: "So I spoke to Chairman HUANG this weekend... And he heard about JOSE [HUIZAR] being FBI investigation."  Chiang advised Esparza to find out more information from Executive Director E.  After Esparza was interviewed by the FBI on June 20, 2017, he disclosed that interview to Executive Director E, HUIZAR, and Kim, among others.  Ex. 1 at 16.

2.   LEE and 940 HILL

LEE and 940 HILL also had the common objective to create and perpetuate the pay-to-play scheme.  This allowed them to achieve the common goals of the criminal enterprise and conspiracy, relying on certain of the same key participants and method of operation:

---

[6] See, e.g., Ex. 1 at 6 (describing how HUIZAR, CHAN, and HUANG "orchestrated an arrangement whereby [HUANG] secured $600,000 in collateral for [HUIZAR] to obtain a personal loan from a bank for $570,000 to privately pay the sexual harassment settlement and legal fees and resolve it without publicly disclosing details"), 5 (describing benefits HUANG provided in "gambling chips" at casinos, private jets, stays at luxurious hotels, among other things).

(1) **Enriching the members of the conspiracy.**  LEE and 940 HILL could benefit financially by paying bribes to get approvals on favorable terms such as avoiding the high cost of unionized labor and fees of a legitimate lobbyist.[7]  Moreover, similar to SZNW, this was not necessarily limited to a single opportunistic occasion of bribery; LEE and 940 HILL could also be further enriched if LEE and HUIZAR established an illicit transactional relationship.

(2) **Maintaining operation of the enterprise.**  LEE had an interest in establishing an ongoing corrupt relationship with HUIZAR because he needed HUIZAR's help during the long life of the 940 Hill Project,[8] and also because he, like HUANG, owned a second project in HUIZAR's district that he was seeking to develop and would require similar approvals through the City process including the PLUM Committee and City Council.[9]

(3) **Concealing financial activities.**  Using the same method of operation as other corrupt developers, LEE employed an intermediary

---

[7] See, e.g., Ex. 1 at 11 ("ESPARZA learned that resolving the appeal on Project C would save [LEE] an estimated $30 million on development costs"); Ex. 3 at 5 (Kim learned from Esparza that "it would cost approximately $1.2 million to $1.4 million to hire a lobbyist to attempt to resolve the appeal"); Casino_1680603 (showing appraisal value of 940 HILL Property at $13.5 million in June 2015, before entitlements); Casino_1677845 (showing appraisal value of 940 HILL Property at $31.5 million in 2019, after entitlements).

[8] See, e.g., Casino_1676416 (February 19, 2018 text message from Kim to LEE: "I need to meet with the planning staff from the cm Huizar's office to discuss Olympic and Hill next week); Casino_1676410 (September 19, 2018 e-mail from a consultant to LEE: "request Olympic and hill llc about air right or space 1,500,000 Justin Kim will handle about this with jose huizar ... and justin kim will do this for fee too").

[9] See, e.g., Casino_0057665 (January 17, 2017 brief from staffer to HUIZAR describing a "Little Tokyo Galleria" project owned by "DAVID LEE" in the Garment/Fashion District, which was seeking several entitlements and a "request 11% very low income units").

(Kim) to negotiate and make the corrupt payment of $500,000 and used cash to avoid leaving a paper trail of his bribe.

(4) **Protecting the enterprise by obstructing justice.** Like other conspiracy members, LEE and 940 HILL engaged in obstruction of justice to protect their criminal venture. See, e.g., Ex. 3 at 9 (LEE advised Kim to conceal the bribery scheme, telling Kim "he should have lied to defendant KIM's attorney about the [bribe] amount"); FSI ¶ 62 (LEE and 940 HILL falsely recorded a $500,000 expenditure in 2018 and falsely categorized it as a legitimate business expenditure).

### 3.   Developers Jia Yuan and Company M

Developer Jia Yuan, like SZNW and 940 HILL, participated in the scheme and had a major development project downtown that required HUIZAR's assistance on an ongoing basis during the long life of the project, and owned multiple developments that stood to benefit from an established corrupt relationship with HUIZAR. Like SZNW and 940 HILL, Jia Yuan employed intermediaries to negotiate the terms of the corrupt agreement (CHAN and Chiang). Jia Yuan had the common goal of concealing financial transactions and employed a similar method of paying HUIZAR in untraceable ways, both by indirect bribe payments and providing benefits on a trip in China. Jia Yuan, like SZNW, also used deceptive methods to engage in foreign campaign contributions to ensure the continued success of the enterprise. See Ex. 5.

Company M similarly participated in the scheme and employed the same method of operation to achieve the same common objective, hiring Goldman to negotiate the corrupt terms of their agreement. Company M also needed HUIZAR on a continued basis during various phases of Project M, but also owned other developments in the City of Los

Angeles, and therefore stood to benefit from the ongoing corrupt pay-to-play scheme.[10]  An executive of the company provided secret benefits to HUIZAR and discussed future illicit benefits with him, while keeping those discussions hidden from his employer, the City, and the public.  See Ex. 6.

### C.   Constant Participants and Method of Operation

Members associates, and allies of the CD-14 Enterprise developed and perpetuated the pay-to-play scheme within the City of Los Angeles, whereby public officials (namely HUIZAR, CHAN, and Esparza), solicited and accepted financial benefits from developers, facilitated through consultants and lobbyists, in exchange for taking official acts and other action to benefit the developers and their projects in Los Angeles.  The roles of the CD-14 Enterprise therefore fell into three categories: (1) public officials; (2) consultants and lobbyist who functioned as intermediaries; and (3) developers.  Each set of participants was a necessary cog of a larger machine, one that could not function without all its parts.  Each set played its designated role through a constant method of operation, ensuring a mutual benefit for the entire operation.

The public officials who participated in the pay-to-play scheme stayed constant (HUIZAR, CHAN, Esparza).  HUANG and SZNW had direct contact with all three public officials.  LEE and 940 HILL had direct contacts with both HUIZAR and Esparza on the two development projects LEE owned.

---

[10] Company M's bribes secured official acts from HUIZAR that resulted in an estimated $14 million in net savings for the company. FSI Overt Act 295.

12

Intermediaries who participated in and facilitated the pay-to-play scheme also stayed constant (Chiang, Kim, Goldman, Executive Director E,[11] and CHAN after he retired from the City). HUANG and SZNW relied on Executive Director E and CHAN to act as intermediaries with HUIZAR and Esparza in the corrupt scheme, and thus had direct contact with four other co-schemers. CHAN, in turn, also acted as an intermediary with Chiang in orchestrating the Jia Yuan corrupt relationship with HUIZAR and Esparza. LEE and 940 HILL relied on Kim as an intermediary. In addition, shortly after resolving the union appeal in March 2017, LEE was in negotiation with another co-schemer, Chiang, to sell the now entitled property at a higher cost to an interested buyer.[12] Thus, successfully resolving the appeal stood to benefit not only LEE, Kim, HUIZAR, and Esparza, but another integral CD-14 Enterprise member (Chiang). And that cycle had the potential to repeat itself with LEE's other project, the Little Tokyo Galleria.

Thus, developers who participated in the pay-to-play scheme had direct contact with the same close-knit group of public officials and intermediaries who constantly moved between the various spokes. This is not a situation where the Developer Defendants had only one touch point of HUIZAR as the hub of the conspiracy. HUANG/SZNW's scheme implicated four other co-schemers (HUIZAR, CHAN, Esparza, and

---

[11] In addition to his role at SZNW, Executive Director E, with the help of HUIZAR, CHAN, and Esparza, sought a consulting contract with Company G. See, e.g., Casino_0027982 (November 22, 2015 "radar screen" drafted by CHAN included an entry for Executive Director E and Company G under "Projects").

[12] See, e.g., Casino_1676732 (May 15, 2017 letter from Chiang to LEE expressing client intent to purchase the "fully entitled" 940 HILL property for $33 million, with a $990,000 commission payment to Chiang).

1    Executive Director E).  LEE/940 HILL's scheme also implicated four

2    other co-schemers (HUIZAR, Esparza, Kim, and Chiang).

3         **D.  Developers' Interest in Success of the Entire Operation**

4         The developers' interest was not limited to a one-off interest

5    of getting a single vote or official act from HUIZAR.  They had an

6    interest in corrupting HUIZAR, then leveraging that corrupt

7    relationship to continue extracting official acts from him on a

8    continued basis.  Every time a developer willingly paid a bribe, the

9    developer reinforced HUIZAR's corrupt pay-to-play scheme and

10   emboldened him to continue making corrupt demands from that developer

11   and other developers, thereby perpetuating the scheme.

12        Intercepted communications establish that developers had a

13   common interest in keeping HUIZAR in power and making him happy by

14   "taking care" of his "needs."  For example, in a call on April 19,

15   2017, Esparza, speaking broadly about a group of developers not a

16   single co-conspirator, told Kim that "the Chinese [developers] want

17   [HUIZAR] to stay here for the long term too," adding that "they

18   already know they are taking care of the Councilman [HUIZAR] and

19   whatever his, you know, needs are."  In a call on May 2, 2017,

20   Esparza told Chiang: "Looking from your perspective, you bank on RAY

21   [CHAN], and JOSE [HUIZAR]'s office to do, one of the main points with

22   JOSE [HUIZAR], for your Chinese clients for example, entitlements,

23   PLUM, you got to use that and we gotta keep making his motherfucking,

24   him happy."  On June 11, 2017, Esparza told Chiang: "I think everyone

25   is in the same boat" and referred to HUIZAR as "the guy we're

26   investing so much time, energy, resource in."

27        Developers who paid bribes to HUIZAR could then have "all the

28   leverage in the world" to extract official acts from him for their

benefit.  Ex. 1 at 9.  The co-schemers all understood that this is

what the developers (and consultants) had to gain.  For example, in a

call on June 23, 2017, Kim told Chiang: "this is my agenda, not only

do I want to make money, George [Chiang], I want to show you and

other Chinese developer, assuming Councilman JOSE [HUIZAR] is there,

how much motivation he's going to have to push everything around for

my project, those are my agenda."  In other words, the objective was

not only to make money on an individual basis, but to create and

entrench a corrupt scheme that could continue to reap benefits for

its corrupt participants in the long run in a mutually beneficial

way.

**III. ARGUMENT**

    **A.    Applicable Law on Single vs. Multiple Conspiracies**

    To determine whether a single conspiracy or multiple

conspiracies exist, the Ninth Circuit applies the following test:

> A single conspiracy can only be demonstrated by proof that
> an overall agreement existed among the conspirators.
> Furthermore, the evidence must show that each defendant
> knew, or had reason to know, that his benefits were
> probably dependent upon the success of the entire
> operation.  Typically, the inference of an overall
> agreement is drawn from proof of a single objective ... or
> from proof that the key participants and the method of
> operation remained constant throughout the conspiracy.  The
> inference that a defendant had reason to believe that his
> benefits were dependent upon the success of the entire
> venture may be drawn from proof that the coconspirators
> knew of each other's participation or actually benefitted
> from the activities of his coconspirators.

United States v. Singh, 979 F.3d 697, 721-22 (9th Cir. 2020) (quoting

United States v. Fernandez, 388 F.3d 1199, 1226 (9th Cir. 2004)).

To assess whether the evidence supports a single scheme, a court may

consider the following factors: "(1) the nature of the scheme; (2)

the identity of the participants; (3) the quality, frequency and

1   duration of each conspirator's transactions; and (4) the commonality

2   of time and goals." United States v. Morse, 785 F.2d 771, 774-75

3   (9th Cir. 1986). The "quality, frequency and duration of each

4   conspirator's transactions," or continuity of a scheme, is relevant

5   to showing how each participant depended on the success of an entire

6   operation. If a participant engages in a single isolated

7   transaction, he is less likely to benefit from the continuity of an

8   entire operation.[13]

9       **B.   Evidence Establishes an Overall Agreement**

10      Here, the inference of an overall agreement that included the

11  Developer Defendants can be drawn from proof of a central objective

12  and from proof that the key participants and the method of operation

13  remained constant throughout the conspiracy.

14           1.   The Common Objective of the Conspiracy

15      The Developer Defendants argue that their only objective was to

16  get their respective development projects approved, and thus they did

17  not share a common goal with other conspirators. As outlined above,

18  the developers' objective was much broader than paying a bribe for a

19  single official act. Moreover, desiring project approval is not

20  mutually exclusive of sharing a common objective.

21  _____

22      [13] The test for a single conspiracy is analogous to establishing
    an association-in-fact RICO enterprise. Proof of such an enterprise

23  requires three criteria: (1) a common purpose (i.e., a common
    objective or "commonality of goals"); (2) an ongoing organization

24  (i.e., constant participants and method of operation or "nature of
    the scheme" and "identity of participants"); and (3) a continuing

25  unit (an interest in the success of an entire operation or the
    "quality, frequency and duration" of involvement). See Odom v.

26  Microsoft Corp., 486 F.3d 541, 552 (9th Cir. 2007) (listing three
    criteria for RICO enterprise); see also Boyle v. United States, 556

27  U.S. 938, 945 (2009) (association-in-fact enterprise must have three
    structural features: a purpose, relationships among those associated

28  with the enterprise, and longevity sufficient to permit these
    associations to pursue the enterprise's purpose).

                                    16

All defendants had a common objective to perpetuate the pay-to-play scheme in the City of Los Angeles whereby public officials gave preferential treatment to developers willing to pay bribes which put them ahead of the dozens of other honest developers also seeking to legitimately benefit from the robust development of CD-14.  Like other members of the CD-14 Enterprise, the Developer Defendants had an incentive to create such a pay-to-play scheme because it would create an exclusive fast track lane for those willing to pay the corrupt toll.  Paying bribes to speed up development projects was more lucrative than playing fair and following the rules.  Developers in this scheme had an incentive to utilize this pay-to-play scheme to ensure that not all developers in the City benefited from this criminal inside track, giving them an edge and financial leg up compared to honest developers.[14]  Developers had an incentive to perpetuate this scheme, to allow it to operate for as long as possible because they would need corrupt favors at many steps of the long life of a mega-development project, and because the Developer Defendants each owned multiple developments in the City.  Their pay-to-play scheme allowed the Developer Defendants to enrich themselves, to place them ahead of other law-abiding developers, to ensure their continued enrichment and success, and to protect themselves and their co-schemers from detection by law enforcement, the City, and the public.

---

[14] See, e.g., Ex. 4 at 11 ("Defendant GOLDMAN understood Executive M to be asking whether Company M's contributions of $50,000 total to PAC B, at Huizar's request, placed them in a 'favored status'" when Executive M asked "Do you think we are in a more favored status with Jose [Huizar] compared to [another developer]?").

That this pay-to-play scheme included multiple spheres of operation or sub-agreements (spokes) does not defeat the existence of a single scheme.  A "single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it might involve two or more phases or spheres of operation."  United States v. Berger, 224 F.3d 107, 114-15 (2d Cir. 2000) (internal quotation marks omitted).  Nor does the existence of "several subagreements or subgroups of conspirators" defeat the existence of a single conspiracy.  Singh, 979 F.3d 697, 722; see also United States v. Arbelaez, 719 F.2d 1453, 1457-58 (9th Cir. 1983) (general test to establish the existence of a single conspiracy "comprehends the existence of subgroups or subagreements") (cleaned up).

"The crucial point that defendants miss in this case is the fact that the jury could find that there were several different agreements involving the defendants, all of which would then connect the defendants to the general overall conspiracy as charged in the indictment."  United States v. Perry, 550 F.2d 524, 532-33 (9th Cir. 1977).  "By these separate agreements the defendants became parties to the larger common plan, joined together by their knowledge of its essential features and scope, though not of the exact limits, and by their single goal. These agreements were merely steps in the formation of the larger and more general conspiracy."  Id. at 533.  The developers' individual agreements to pay bribes for their respective development projects were "merely steps in the formation of the larger and more general conspiracy."  Their bribes and patronage of HUIZAR was necessary for the entire enterprise to survive and thrive.  Without HUANG's $600,000 payment in 2014, HUIZAR may have lost re-election in 2015, which would have doomed the other

1  developers who subsequently benefited from his corrupt scheme.

2  Without the financial support in the form of bribes from the corrupt

3  developers interested in electing HUIZAR Relative 1, the scheme may

4  have ended with HUIZAR's term.

5          2.   The Key Participants and Method of Operation

6       The key participants and method of operation of this scheme

7  stayed constant over the course of approximately five years, from

8  February 2013 to December 2018.  Developers with major development

9  projects in Los Angeles employed intermediaries like consultants and

10 lobbyists to pay certain public officials in charge of the City

11 development process to take favorable actions on their developments.

12 This was not a vague and disconnected pay-to-play scheme where

13 various unrelated types of official acts were bought by a wide

14 variety of individuals for wholly independent ends.

15      To the contrary, the specific public officials at the hub of

16 this conspiracy all played crucial roles in the City approval process

17 for development projects: the City Councilmember of CD-14 and Chair

18 of the PLUM Committee (HUIZAR), his Special Assistant and right-hand

19 man (Esparza), and the General Manager of the LADBS and later Deputy

20 Mayor (CHAN).  The specific official actions alleged in this

21 conspiracy are also limited to those that impact development projects

22 and developers.  As a City Councilmember, HUIZAR had considerable

23 power to take other types of official acts like pass legislation,

24 make hiring decisions, influence alcohol and marijuana permits and

25 licenses, or award City contracts and funding.  But the FSI focuses

26 on a discrete universe of official acts designed to benefit

27 developers as part of one cohesive scheme.

28

As set forth above, in addition to the hub of public officials, the scheme employed common intermediaries like Chiang, Kim, Goldman, and Executive Director E to facilitate the corrupt relationship between officials and developers.  These intermediaries knew about each other and worked in concert with each other and the public officials to advance their goals.  The method of operation employed for each development project was the same.  Defendants HUIZAR, CHAN, and Esparza would solicit and request benefits from developers with pending projects through the consultants.  The consultants would then communicate the request to the developer and coordinate the corrupt exchange with willing developers.  The FSI draws a conspiracy rim around the willing developers who agreed to participate in the pay-to-play scheme that is circumscribed not only by their desire to advance their own projects, but to effectuate a corrupt system from which they could continue to benefit along with other corrupt developers, at the exclusion of law-abiding developers.

For a single scheme to exist, it is not necessary for each member to participate in every aspect of the scheme.  See United States v. Morse, 785 F.2d 771 (9th Cir. 1986).  In Morse, the indictment alleged "a scheme and artifice to defraud" and that "[a]s part of said scheme and artifice to defraud, and in furtherance thereof [appellants] would and did engage in the following activities and conduct[.]"  Id. at 774.  "The indictment goes on to enumerate the activities of appellants in the oil and gas drilling projects, and video, heavy equipment, and secondary oil recovery programs."  Id.  While one defendant "was directly involved in all four ventures; [a second defendant] participated in only the video game and heavy equipment ventures."  Id. at 775.  In reviewing a challenge to the

indictment as duplicitous, the Ninth Circuit considered whether "a description of the four investment programs necessarily embraces more than a single scheme."  The court concluded the indictment alleged a single scheme, noting that the law of this circuit "takes a broad view of single scheme: 'the defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme.'"  <u>Id.</u> (citation omitted).  The Ninth Circuit also concluded that the evidence at trial proved a single scheme where the four "ventures comprising the scheme were of a similar nature," even though not all defendants participated in each venture.  Under those circumstances, just as here, "the risk of evidentiary spillover is slight" because the defendants' "involvements in the four investment projects were clearly detailed in the indictment.  The situation is thus inapposite to <u>Kotteakos</u> where evidentiary spillover resulted from jury trial of thirteen defendants for involvement in more than eight conspiracies." <u>Id</u>. at 775.

### C.  Benefits Depended on Success of Entire Operation

To prove a single conspiracy, the government need <u>not</u> show "that each of the defendants worked directly with each other nor even show[] that all of the defendants knew each other." <u>Perry</u>, 550 F.2d 524, 528.  "The government does not have to prove that all of the defendants met together at the same time and ratified the illegal scheme.  This just is not the nature of a conspiracy." <u>Id.</u> at 533.  Instead, the government must show that each defendant "had reason to believe that their own benefits derived from the operation were dependent upon the success of the entire venture."  <u>Id.</u> at 529.

As set forth above, the common objective of the CD-14 Enterprise explains how each defendant's benefits from the operation were dependent upon the success of the entire venture.  The pay-to-play scheme they established with HUIZAR allowed them to all continue profiting from the corrupt system, including by getting HUIZAR's relative to succeed him when his term expired in 2020 and by protecting the CD-14 Enterprise so it could continue its operation without detection.

As the Chair of the powerful PLUM Committee, which had City-wide jurisdiction over projects, HUIZAR had voting power and control of the PLUM agenda, and therefore controlled which projects were slated for a vote in the approval process.  Scheme participants recognized the great powers HUIZAR held and had a common purpose of maintaining him in power and fulfilling his corrupt "needs" to benefit from the continued pay-to-play scheme.  The longer the scheme existed the better chance the development projects would survive the gauntlet of the often multi-year City approval process.  Each bribe paid not only secured a specific official act, but it also established that the developer was a willing participant who would continue to provide benefits in exchange for favored treatment by HUIZAR and his staff; such future asks were routine in development projects.  In turn, each bribe paid allowed and emboldened HUIZAR to continue demanding corrupt payments from these and other developers who demonstrated commitment to their joint corrupt cause.

The recent Ninth Circuit opinion in United States v. Singh, 979 F.3d 697, is instructive.  There, the indictment charged four individuals and one corporate defendant "with conspiring to commit campaign finance fraud in the 2012 San Diego mayoral elections" and

1    tried the four individuals in a joint trial.  Id. at 722.  The case
2    involved a foreign national, Azano, who "aspired to participate in
3    developing San Diego and turning it into the Miami Beach of the west
4    coast.  To help achieve this goal, Azano and his co-conspirators
5    sought to influence local politicians during the 2012 San Diego
6    election cycle by providing campaign contributions."  Id.  "Azano's
7    funding scheme involved a number of people," including a former San
8    Diego police officer with political connections who helped represent
9    Azano's interest with two campaign organizations (Encinas), another
10   individual who provided lobbying connections (Cortes), a local car
11   dealer who arranged straw donors to donate to a mayoral campaign
12   (Chase), Azano's son who also recruited straw donors (Hester), and
13   Singh, the CEO of a media platform who worked on the San Diego
14   campaigns.  Id. at 707-08.

15   On appeal, Singh argued that "there was insufficient evidence of
16   a single conspiracy to sustain his conviction" and claimed that
17   instead "the Government proved only a 'rimless conspiracy' under
18   which his conviction could not stand."  Id. at 721.  At trial, the
19   "Government provided sufficient evidence that Singh knew Azano and
20   Encinas and the role they played in coordinating efforts for the San
21   Diego mayoral race," but there was "no direct evidence that Singh
22   knew of the subgroup that obtained straw donors [Hester, Cortes, and
23   Chase]."  Id. at 722.  Here too, the Developer Defendants essentially
24   argue that no single scheme exists because there is no evidence that
25   they knew of the "subgroups" involved in other development projects.

26   As to proof of a single overall agreement, Singh argued, similar
27   to the defendants here, "that his only objective was to make money
28   for his social media business, not to influence elections."  Id.  The

Ninth Circuit rejected that argument, finding that "the jury could reasonably have concluded that Singh's goal was broader" and included "generally assisting Azano with the campaigns," a goal shared by all the conspirators, whose "efforts benefitted the common goal of electing Azano's chosen mayoral candidates." Id. at 722, 732.  The Court should similarly reject the Developer Defendants' argument that their only objective was to "make money" on their individual projects, when the evidence establishes a broader goal of perpetuating a pay-to-play scheme benefitting them at the exclusion of honest developers.

As to Singh's lack of knowledge of other aspects of the scheme, the Ninth Circuit noted that "the Government did not need to show that Singh knew all of the purposes of and all of the participants in the conspiracy." Id. at 722 (cleaned up).  "Instead, while there may not have been proof of direct knowledge of Hester's, Cortes's, or Chase's contributions, there was proof that Singh benefitted from them, as they all worked towards election of mayoral candidates.  The straw donations that Hester, Cortes, and Chase obtained, whether for the individual campaigns or for PACs, affected Singh's success as a 'volunteer' for the campaigns.  All of their efforts benefitted the common goal of electing Azano's chosen mayoral candidates.  Under the standard in Fernandez, this was sufficient to show a single conspiracy."  Id.  Here, too, all of the developers' efforts benefitted the common goal of perpetuating the pay-to-play scheme.

That certain developers may have been competitors to some degree in the Los Angeles development sphere does not defeat their common interest in the success of the entire corrupt operation.  For example, in examining the "commonality of time and goals," the Ninth

24

Circuit explained: "All appellants were interested in distributing as much cocaine as possible to earn as much profit as possible.  To achieve this goal, all were interested in being part of a distribution network that could distribute large amounts of cocaine.  Appellants were part of the illegal enterprise that centered on Beron at the same time, some being more active than others, depending on their ability at any given moment to supply the cocaine."  United States v. Arbelaez, 719 F.2d 1453, 1458 (9th Cir. 1983).  Here, too, the developers were all interested in getting as much favored treatment from HUIZAR as possible.  To achieve this goal, they had a mutual interest in being part of a corrupt network that could facilitate the exchange of official acts for bribes.  "The fact that appellants may have competed with each other for [HUIZAR]'s patronage did not make them any less interested in maintaining the overall [pay-to-play bribery] network."  Id. at 1459.

At trial, the jury may reject this theory and find defendants not guilty of the scheme to defraud (while finding them guilty of the individual substantive § 666 counts).  But applying a preponderance standard at this stage of the proceedings, there is sufficient proof of the existence of an overarching scheme to defraud Angelenos.

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court find that a single scheme or conspiracy existed as alleged in the indictment, and therefore deny the requests for severance.  In the alternative, the government requests it be allowed to further brief that a joint trial with appropriate limiting instructions would cure the limited risk of prejudicial spillover here.